|   |   |
|---|---|
| IN THE UNITED STATES DISTRICT COURT | |
| FOR THE NORTHERN DISTRICT OF CALIFORNIA | |
| OAKLAND DIVISION | |

**JOSE BAUTISTA,**

    Petitioner,

    v.

**MARION SPEARMAN, Warden,**

    Respondent.

16-cv-03174-YGR

**ORDER DENYING PETITION FOR HABEAS CORPUS RELIEF**

Now before the Court is petitioner Jose Bautista's amended petition for a writ of habeas corpus. (Dkt. No. 4, Petition.) The government answered on December 1, 2016, (Dkt. No. 24-1), and petitioner filed a traverse in reply on February 6, 2017. (Dkt. No. 27, Traverse.) Petitioner claims that his counsel rendered ineffective assistance. Specifically, petitioner claims that counsel failed to: (1) investigate, obtain an expert on, and move to exclude the prosecution's evidence on gunshot residue ("GSR")[1]; and (2) request an instruction on a lesser-included firearm enhancement.

Based thereon, petitioner seeks a writ of habeas corpus. Having carefully considered the petition and the papers submitted, and for the reasons stated below, the petition for such relief is **DENIED**.

**I.   BACKGROUND**

On July 21, 2011, a Santa Clara County jury found petitioner Jose Bautista guilty of

---

[1] Petitioner also claims that "counsel's failure to investigate denied the petitioner his right to present witnesses under the compulsory clause of the Sixth Amendment, and his right to present a complete defense to the charges." (Petition at 27.) The Court finds that it is without jurisdiction to hear this claim because petitioner did not raise this claim in either his petition to the California Court of Appeal or California Supreme Court. Notably, petitioner does not discuss this claim in his Traverse, suggesting that petitioner concedes that the Court cannot hear this claim.

1

second degree robbery, attempted second degree robbery, and willful discharge of a firearm with gross negligence. (Dkt Nos. 8, 9, Court of Appeal Order at 1.) The jury found true the state's allegations that defendant personally used and intentionally discharged a firearm during the commission of the robbery and attempted robbery. *Id.* On May 23, 2013, the trial court sentenced petitioner to a term of twenty-two years in state prison. (Dkt. Nos. 24-4, Exh. A at 380; 24-7, Exh. D at 597-599.) On March 2, 2015, the California Court of Appeal affirmed the judgment of the trial court in an unpublished opinion and denied the habeas petition. (Court of Appeal Order at 1.) In addressing the petitioner's claims on appeal, the California Court of Appeal summarized the relevant facts as follows:

### A. The Robbery and Firearm Discharge

At the end of May 2009, Bunlong Hong wanted to buy a used Honda or Acura car. He responded by email to a Craigslist advertisement of an Acura Integra. A person using the email address trannguen@hotmail.com corresponded with him and provided a phone number with an 831 area code. The person said his name was Tran and that he needed to sell the Integra because he had "a baby on the way."

Hong called the phone number. A female voice answered, but when Hong asked for Tran, the female said it was the wrong number. Hong called back later. This time, when he asked for Tran, the female said, "He'll have to give you a call back." Hong later received a call back from the same phone number. A male spoke to him and they made plans to meet so Hong could purchase the Integra.

On May 31, 2009, Hong's coworker, Phong Tang, gave Hong a ride to San Jose. Upon arriving in San Jose, Hong called the phone number. A female answered again, telling Hong he would get a call back. The male called back a few minutes later. They set up a meeting place. Hong then went to the bank and withdrew cash.

Hong and Tang arrived at the designated meeting spot, in front of a house on Yerba Buena Avenue, at about 3:00 p.m. Seeing no one at the location, Hong called the phone number again. The male answered and said he would be there in a few minutes. Shortly thereafter, two individuals approached. Both were dressed inappropriately for the warm weather: they were in hooded sweatshirts, with the hoods pulled up over their heads. One of the individuals—later identified as defendant—wore a plain black sweatshirt. The other individual wore a tan sweatshirt with printing on it.

Defendant and his companion stood about five feet away from Hong and Tang. Defendant told Hong and Tang to get into their car. When Hong and Tang did not do so, defendant repeated his command. Tang then said, "We're not going to get in the car." In response, defendant asked, "You think I'm playing?"

Defendant then pulled a revolver out of the front pocket of his sweatshirt and fired a round into the air. He directed Hong and Tang towards the car. As Hong and Tang started to get into the car, defendant asked Tang for his wallet.

At that point, a neighbor came out of a nearby house and asked, "What's going on?" Defendant told Tang to "[h]urry up" and give him the wallet, which Tang did. Defendant and his companion left soon afterwards, driving away in a car located nearby, which appeared to be a Nissan Maxima.

**B. 911 Call and Initial Descriptions**

Hong called 911 following the incident, saying he had just been "mugged." He described the Maxima as silver, tan, champagne, or gold colored. He described the two men as being in their early to mid 20's and Hispanic.

In the 911 call, Hong said the shooter had been wearing a black pull-over sweatshirt and a baseball cap. The shooter's baseball cap was red with a red bill; it looked like "a Cincinnati one." The shooter was "heavyset"—between 240 and 250 pounds—and about six feet tall. He had "[l]ight fuzz" on his mustache area. The second person had been wearing a tan colored hoodie. The second person was also "big"—about 230 to 240 pounds.

When police responded to the site of the shooting and robbery, Hong provided the phone number that he had called to set up the meeting. The phone number belonged to Elisa Ramirez, who had a dating relationship with defendant.

Hong told a responding officer that the shooter had been a Hispanic male, about 18 to 20 years old, about six feet two inches tall, weighing about 240 pounds. The shooter wore a black hoodie and a red baseball cap with a "C" on it.

According to Hong, the second person was also a Hispanic male, also about 18 to 20 years old, about five feet 11 inches tall, weighing about 220 pounds. The officer's notes indicated that Hong said that the second person had also been wearing a black hoodie.

Tang told a responding officer that the shooter had been wearing a baseball cap, which was black with red on the underside of the bill. Both men had been wearing hooded sweatshirts with the hoods up. The shooter wore latex gloves and a black hooded sweatshirt. The shooter was about six feet to six feet one inch tall

and weighed about 240 pounds. The shooter had a light goatee and light brown eyes.

According to Tang, the second person was about five feet 10 inches or five feet 11 inches, weighed about 230 pounds, and wore a gold or yellow colored hooded sweatshirt.

Tang was shown a photo lineup on the same day as the incident. He identified a photo of defendant, saying, "I think that's the guy who had the gun."

**C. Defendant's Arrest**

San Jose Police Officers Gina Tibaldi and Lee Tassio went to defendant's residence within a few hours of the incident. Defendant and two men (his brothers) were outside, drinking beer, when the officers arrived. Defendant was wearing a black hooded pull-over sweatshirt and a red baseball cap with white lettering.

Due to the possibility that defendant had a gun, the officers took cover behind their patrol car doors and ordered the three men to show their hands and go down to the ground. The three men did not comply despite repeated commands. Defendant then threw his hat onto the ground and dove into a minivan, while his brothers "proned out" on the ground. Officer Tassio ordered defendant to come out of the minivan, and about 30 seconds later, defendant did so. Officer Tassio then placed defendant under arrest.

Police collected evidence from defendant's house that night. A computer found on the kitchen table contained photographs of a green or teal Acura. The photographs were the same ones in the Craigslist ad, and they had been last accessed by a user on May 28, 2009. The computer had also been accessed by a person using the email address trannguen@hotmail.com.

Defendant's mother owned a Nissan Maxima that was later located at defendant's residence. The police did not find a revolver or any items belonging to Hong or Tang at defendant's residence.

**D. Gunshot Residue**

At about 9:15 p.m. on the night of defendant's arrest, Officer Tassio performed a gunshot residue test on defendant's hands in an interview room at the police station. Officer Tassio wore latex gloves during the procedure, but he had not been wearing gloves when he handcuffed defendant.

Criminalist Melissa Hengoed analyzed the gunshot residue test kit obtained by Officer Tassio, and she examined defendant's sweatshirt for gunshot residue.

At trial, Hengoed explained that gunshot residue particles contain three elements: lead, barium, and antimony. The presence of individual lead, barium, and antimony particles can also indicate

that a gun was fired. Although those individual elements can come from alternative sources other than a firearm, when they are combined with an actual gunshot residue particle it is more likely that they, too, came from a firearm.

If gunshot residue particles are found on someone's hand, it may indicate any of the following: (1) the person was in the proximity of a firearm; (2) the person discharged a firearm; (3) the person handled a firearm; or (4) the person was in contact with a surface that contained gunshot residue—in other words, there was a transfer of the gunshot residue to the person from something or someone else.

When a firearm discharges, gunshot residue spreads, on average, 14 feet downrange and two to three feet on either side. Gunshot residue is easily lost by a person's normal daily activity. Most gunshot residue is lost within two to three hours.

Defendant's sweatshirt contained individual antimony, lead, and barium particles on both sleeves and on the front pouch area. There were also individual antimony, lead, and barium particles on the sample taken from defendant's right hand. There was one gunshot residue particle (i.e., a particle containing all three elements) on the sample taken from defendant's left hand.

Hengoed testified it was possible that gunshot residue transferred to defendant's hands from the arresting officer's hands, since the officer drew his gun before handcuffing defendant and did not wear gloves during the arrest. The crime lab recommends that officers wear gloves during arrests in order to prevent gunshot residue transfers. It was also possible that gunshot residue transferred to defendant's hands from the police car seat, since defendant's hands were handcuffed behind his back as he rode in the police car.

**E. November 2010 Photo Lineup**

About six months after the incident, in November of 2010, Hong had been shown a photographic lineup. No. 6 in the lineup was a man named Wingel Zelaya. Hong had picked out No. 6 and said it looked like "one of the guys involved," meaning the accomplice, not the shooter. Tang was also shown the photographic lineup with Zelaya's photo in November of 2010, but he had not picked anyone.

**F. Trial Descriptions**

At trial, Hong described the shooter as wearing a black hooded sweatshirt, weighing about 230 pounds, and five feet 10 inches to five feet 11 inches tall. He explained that a Cincinnati hat would have a white "C" on it. Because the shooter's hood covered some of the cap, Hong could have been mistaken about the logo. Hong

described the man in the tan sweatshirt as about the same weight as the shooter, but shorter: about five feet nine inches tall.

At trial, Tang described the shooter as wearing a black sweatshirt and a black baseball cap with a red bill. The shooter's hood was covering some of the baseball cap, so Tang did not see any logo on the cap. According to Tang, the shooter had been about six feet or six feet one inch tall; the other man had been two to three inches shorter. Both were "heavyset." The gunman had worn latex gloves and had a "light goatee."

Neither Hong nor Tang was able to identify defendant at trial. Hong had not been able to identify defendant at the preliminary hearing.3 At both the preliminary hearing and at trial, defendant wore glasses. During the incident, neither the shooter nor the other man had been wearing glasses. According to Tang, defendant's weight was different than the person he had identified as the shooter in the photo lineup shown on the day of the incident.

**G. Defense Case**

The defense theory was that defendant was not the shooter, although he may have been the accomplice. The defense presented evidence suggesting that Zelaya was the shooter.

Sandra De La Cruz was pregnant with Zelaya's baby in May of 2009. She asked Zelaya to help her out financially at that time. Zelaya was "on the heavy side." In 2009, he owned and wore a red baseball cap. Defendant and Zelaya had become friends through De La Cruz.

De La Cruz considered defendant a "real close friend," like a little brother. She was also close with defendant's family, and she had told defendant she would do her best to help him. At the time of trial, De La Cruz had a custody case with Zelaya, who had cheated on her.

Defendant's brother, Michael Bautista, had been present at the time of defendant's arrest. The three brothers had been listening to music coming from the minivan. They thought the police were coming because the music was loud. Defendant had reached into the minivan to turn down the music, but he had not gone inside the minivan.

*Id.* at *1-5. On June 10, 2015, the California Supreme Court denied review of the Court of Appeals decision regarding petition's ineffective assistance of counsel ("IAC") claims. (Dkt. No. 24-27, Exh. O.)

///

///

6

## II. APPLICABLE STANDARDS OF REVIEW

### A. Legal Standard

A federal court may entertain a petition for a writ of habeas corpus on behalf of a person in state custody "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Under the Antiterrorism and Effective Death Penalty Act ("AEDPA") of 1996, section 2254(d)(1), a state prisoner can obtain habeas relief regarding a claim adjudicated in state court only if the adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established [f]ederal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the [s]tate court proceeding." 28 U.S.C. § 2254(a).

A state court decision is "contrary to" clearly established federal law, as determined by the Supreme Court, only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000). A state court decision is considered an "unreasonable application" of clearly established federal law, as determined by the Supreme Court, if it correctly identifies a governing legal principle from a Supreme Court decision but "unreasonably applies that principle to the facts of the prisoner's case." *Id*. at 413. A federal court reviewing a habeas petition cannot issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id*. at 411. Rather, a federal court may grant the writ only if they find the state court decision was contrary to or an unreasonable application of a clearly established federal law. *Id*. at 412–13. The Supreme Court has ruled that the petitioner has the burden of showing that a state court decision is an objectively unreasonable application of clearly established federal law. *See Cullen v. Pinholster*, 563 U.S. 170, 181 (2011); *Harrington v. Richter*, 562 U.S. 86, 98, 101–03 (2011).

AEDPA requires a highly deferential standard for evaluating state court rulings and "demands that state court decisions be given the benefit of the doubt." *Woodford v. Visciotti*, 537

U.S. 19, 24 (2002); *see also Lindh v. Murphy*, 521 U.S. 320, 334 n.7 (1997). "[A] habeas court must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Harrington*, 562 U.S. at 102. A federal court should only grant relief due to a constitutional error of the state court when the error was not harmless, that is, only if it had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 623, 638 (1993).

A district court may review a state court's determination de novo where the court failed to adjudicate a petitioner's claim on the merits. *See Johnson v. Williams*, 133 S. Ct. 1088, 1097 (2013) ("The language of 28 U.S.C. § 2254(d) makes it clear that this provision applies only when a federal claim was 'adjudicated *on the merits* in State court.'"). "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington v. Richter*, 562 U.S. 86, 99 (2011) (noting, however, that this presumption may be overcome where "there is reason to think some other explanation for the state court's decision is more likely"). Moreover, "[w]here there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991).

### B. Exhaustion of Remedies

An application for a writ of habeas corpus on behalf of a person in custody, pursuant to a State court judgment, "shall not be granted unless it appears that [] the applicant has exhausted the remedies available in courts of the State." *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999). Accordingly, "[b]efore a federal court may grant habeas relief to a state prisoner, the prisoner must exhaust his remedies in state court." *Id; Rose v. Palmateer*, 395 F.3d 1108, 1110 (9th Cir. 2005) ("Pursuant to 28 U.S.C. § 2254(b)(1)(A), a federal court may not consider the merits of [petitioner's] claim unless he has exhausted all available state court remedies.").

In order to exhaust a claim, the defendant must "fairly present" the factual and legal bases for each claim to the state's highest court. *Duncan v. Henry*, 513 U.S. 364, 365 (1995); *Picard v. Connor*, 404 U.S. 270, 275 (1971). "[A] claim for relief in habeas corpus must include reference to a specific federal constitutional guarantee, as well as a statement of the facts that entitle the petitioner to relief." *Gray v. Netherland*, 518 U.S. 152, 162-163 (1996). Thus, state prisoners must "give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process," including discretionary review to the state supreme court if that is the state's practice. *O'Sullivan v*, 526 U.S. at 845.

**C. Analysis**

Petitioner now asserts two grounds for relief: IAC based on counsel's failure to (1) investigate available literature on required procedures for the collection and testing GSR samples, consult and retain an expert on, and pursue a motion to exclude the prosecution's evidence on GSR; and (2) request a lesser-included firearm enchantment instruction. The government concedes petitioner has exhausted his remedies as to issue 1, but contends that issue 2 is unexhausted because the claim was never presented to the California Supreme Court. (Dkt. No. 24-1 at 15.) With regard to both grounds for relief, petitioner argues that the California Court of Appeal did not rule on the merits of petitioner's habeas petition and thus the court's decision is not entitled to deference.

    1. Exhaustion of Remedies

The Court first addresses the issue of exhaustion as to issue 2.

Having reviewed Bautista's petition for review to the Supreme Court of California, the Court finds that petitioner did not "fairly present" the factual and legal bases for his IAC claim that trial counsel failed to request an instruction on a lesser-included firearm enhancement to the California Supreme Court. (Dkt. No. 24-26, Exh. N, Petition for Review to Supreme Court of California; *Duncan v. Henry*, 513 U.S. 364, 365 (1995); *Picard v. Connor*, 404 U.S. 270, 275 (1971).) Thus, the state court has not had "one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sulliban v. Boerckel,* 526 U.S. 838, 842 (1999). *Rose v. Palmer*, 395 F.3d 1108, 1110 (9th Cir. 2005) ("a federal court may not consider the merits of [petitioner's] claim unless he has exhausted

all available state court remedies). Petitioner does not address issue 2 in his Traverse, suggesting that he concedes that state court remedies have not been exhausted with regard to issue 2.

Because petitioner has not exhausted available state court remedies, this Court may not consider the merits of petitioner this claim. *See Rose*, 395 F.3d at 1110; 28 U.S.C. § 2254(b)(1)(A) (". . . . An application for a writ of habeas corpus . . .shall not be granted unless it appears that – (A) the applicant has exhausted the remedies available in the courts of the State . . .")

2. California Court of Appeal Determination on the Merits

The Court now turns to whether the California Court of Appeal issued a decision on the merits regarding claim 1. Petitioner claims that the state court did not rule on the merits of Bautista's habeas petition and the court's decision is therefore not entitled to deference. Specifically, petitioner arguers that the Court of Appeal did not "discuss or indicate that it considered the facts alleged in the petition for a writ of habeas corpus or the supporting exhibits." (Petition at 45.)

Petitioner does not persuade. The state court plainly considered and discussed the petition for a writ of habeas corpus. (Court of Appeal Order at 2 ("Appellate counsel has filed a petition for writ of habeas corpus, which this court considered with the appeal . . . .").) Further, the state court's ruling addressed several aspects of petitioner's IAC claims reflected in issue 1. The Court recognizes that the state court did not specifically discuss each and every one of petitioner's arguments, notably counsel's failure to consult and retain an expert on GSR. However, the state court may have simply chosen to address what it deemed to be the stronger of the multiple ineffective assistance arguments, specifically counsel's failure to investigate and move to exclude the GSR evidence in its entirety. The circumstances thus do not warrant an inference that the state court failed to adjudicate issue 1 on the merits. *See Harris v. Superior Court of State of Cal., Los Angeles Cty.*, 500 F.2d 1124, 1128 (9th Cir. 1974) (a "postcard denial without opinion" constitutes adjudication on the merits absent circumstances indicating otherwise). Thus, the state court decision is entitled to deference.

///

///

### III. INEFFECTIVE ASSISTANCE OF COUNSEL

#### A. Legal Framework

In order to establish IAC, petitioner must show that: (i) his counsel performed deficiently and (ii) the deficient performance in fact prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984). A reviewing court should deny an IAC claim if the petitioner cannot adequately demonstrate either of the *Strickland* prongs. *Id.* at 697 (courts are not required to address both prongs of the test if the petitioner fails on one).

In establishing the first prong of *Strickland*, petitioner must show that his counsel's performance was deficient, i.e., it fell below an "objective standard of reasonableness" under predominant professional norms. *Id.* at 687–88. The reviewing court should treat counsel's conduct with a strong presumption that the conduct is within the realm of reasonable professional assistance. *See id.* at 689.

In order to establish the second prong, petitioner must show counsel's deficient performance prejudiced him, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Petitioner must establish that counsel's errors were so severe as to dispossess the petitioner of a fair trial and reliable verdict. *Id.* at 692. When a petitioner is challenging a conviction, the pertinent question is "'whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt.'" *Hinton v. Alabama*, 134 S. Ct. 1081, 1089 (2014) (quoting *Strickland*, 466 U.S. at 694). For petitioner to show prejudice due to counsel's failure to file a motion, petitioner has to prove that (1) had his counsel filed the motion, it is reasonably probable that motion would have been granted, and (2) had the motion been granted, it is reasonably probable that the result of the trial would have been more favorable to him. *Wilson v. Henry*, 185 F.3d 986, 990 (9th Cir. 1999).

For a federal court reviewing IAC claims in a habeas proceeding, the question "is not whether a federal court believes the state court's determination" under *Strickland* "was incorrect[,] but whether [that determination] was unreasonable—a substantially higher threshold." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (citations omitted). Under section 2254(d), a

federal habeas court reviewing *Strickland* claims should apply a decidedly deferential standard to state court decisions. *See Knowles*, 556 U.S. at 123 (citing *Yarborough v. Gentry*, 540 U.S. 1, 5–6 (2003)); *see also Cullen*, 563 U.S. at 202 (holding that a federal habeas court applies a "doubly deferential" standard of review in analyzing IAC claims under section 2254). In examining a habeas IAC claim, if petitioner cannot prove the deficient performance prong, a federal court does not need to explore *Strickland*'s prejudice prong. *See Siripongs v. Calderon*, 133 F.3d 732, 737 (9th Cir. 1998). Inversely, it is unnecessary for a federal habeas court to decide whether counsel's performance was deficient before examining whether petitioner was prejudiced due to the purported deficient performance of his counsel. *See Strickland*, 466 U.S. at 697; *Williams v. Calderon*, 52 F.3d 1465, 1470 & n.3 (9th Cir. 1995) (affirming the district court's refusal to contemplate whether counsel deficiently performed after already deciding that petitioner could not show prejudice).

The pronounced deference in Strickland for reviewing a defense counsel's effectiveness provides state courts with more flexibility in reasonably applying the rule, consequently "translat[ing] to a narrower range of decisions that are objectively unreasonable under AEDPA." *Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Because the *Strickland* prejudice examination is comprehensive in itself, there is no need for a habeas court to employ the harmless error review under *Brecht*. *Brecht*, 507 U.S. at 637; *see also Musladin v. Lamarque*, 555 F.3d 830, 834 (9th Cir. 2009).

"[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. "In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id*.

**B. Analysis**

Petitioner argues that his trial counsel's failure to (1) investigate, (2) consult and retain an expert on, and (3) move to exclude the prosecution's evidence on gunshot residue was IAC. The state court rejected petitioner's claim, reasoning that the decision not to pursue a motion to

12

exclude the GSR evidence was reasonable. Specifically, the state court found that had counsel pursued such a motion the trial court could have reasonably determined that criticisms regarding the reliability of the GSR evidence went to weight, not admissibility. The Court of Appeal explained:

> **Evidence Code Section 801**
> Defendant first contends the gunshot residue evidence would have been excluded pursuant to Evidence Code section 801, which provides: "If a witness is testifying as an expert, his [or her] testimony in the form of an opinion is limited to such an opinion as is: [¶] (a) Related to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact; and [¶] (b) Based on matter (including his [or her] special knowledge, skill, experience, training, and education) perceived by or personally known to the witness or made known to him [or her] at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his [or her] testimony relates, unless an expert is precluded by law from using such matter as a basis for his [or her] opinion."
>
> According to defendant, the basis of the gunshot residue evidence—the collection method—was so unreliable as to make the evidence inadmissible pursuant to Evidence Code section 801. (See *People v. Boyette* (2002) 29 Cal.4th 381, 449 [" 'any material that forms the basis of an expert's opinion testimony must be reliable' "].) He points out that the gunshot residue sample was collected about six hours after the incident, after defendant had been handcuffed and placed in the back of a police car by an officer who had recently handled a firearm.
>
> Defendant has filed a request for judicial notice. He asks that we consider three documents not presented to the trial court: a California Department of Justice (DOJ) Physical Evidence Bulletin from 2011; a Federal Bureau of Investigations (FBI) Law Enforcement Bulletin from 2011; and a journal article entitled "Summary of the FBI Laboratory's Gunshot Residue Symposium, May 31—June 3, 2005." We take judicial notice of these documents, but they do not establish that the gunshot residue collection in this case was so unreliable as to require exclusion of the evidence.
>
> Defendant contends that neither the DOJ nor the FBI would have accepted the six-hour gunshot residue sample. Under the DOJ's sampling and submission criteria, "[t]he time interval between shooting and sampling should not exceed 4 hours." "For its acceptance policy, the FBI Laboratory uses a cutoff of 5 hours." However, both FBI documents indicate that these time cutoffs are not uniform. According to the FBI Law

Enforcement Bulletin, different laboratories have different criteria, and some laboratories will accept gunshot residue collected beyond five hours after a shooting. According to the Summary of the FBI Laboratory's Gunshot Residue Symposium, "Many participants [at the symposium] stated that an acceptable cutoff time is 4 to 6 hours after the shooting event, whereas some felt that up to 8 hours was appropriate. Still others were comfortable accepting lifts taken more than 12 hours after the shooting."

Defendant also contends the gunshot residue collection here caused unreliable results because the collection did not occur until after defendant was handcuffed and transported to the police station, by an officer who had recently touched his firearm. The DOJ's sampling and submission criteria specifies that "[s]amples should be taken immediately after contact with the subject in the field," and that "[t]o minimize the risk of contamination and/or loss of potential GSR [gunshot residue], sample before handcuffing, transporting, or fingerprinting." The FBI Law Enforcement Bulletin similarly states that "preferably," gunshot residue samples should be collected "before transportation to the police station." According to the Summary of the FBI Laboratory's Gunshot Residue Symposium, symposium participants agreed that sampling should be done at the scene if possible, or "bagged in order to prevent possible contamination," and that "it is possible for a handcuffed person's hands to be contaminated by the prior presence of GSR in the backseat of a police vehicle."

A trial court has broad discretion in determining the admissibility of expert testimony. (*People v. Bui* (2001) 86 Cal.App.4th 1187, 1196.) Here, although the circumstances of the gunshot residue collection were not ideal, the gunshot residue evidence collected in this case was not so unreliable as to require exclusion under Evidence Code section 801. Significantly, one particle of gunshot residue and individual particles of the component elements were found on both of defendant's hands, on the front of defendant's sweatshirt, and on both sleeves of his sweatshirt. The presence of particles in multiple places on defendant's person and clothing tended to negate any inference that the particles were present solely due to transfer. Moreover, the expert herself acknowledged that she could not conclude that the particles were present because defendant had discharged a firearm, and she acknowledged that transfer was one possible explanation; she did not opine that defendant had in fact discharged a firearm. Had defendant sought to exclude the gunshot residue evidence as unreliable, the trial court could have reasonably determined that the question of reliability went to the weight to be accorded the gunshot residue evidence, not the admissibility of the expert's opinion.

**Evidence Code Section 352**
Defendant next contends the gunshot residue evidence would have been excluded pursuant to Evidence Code section 352, which provides: "The

14

court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." According to defendant, the gunshot residue evidence had no probative value because of the "flaws" in the collection procedures, and it presented "an extremely high danger of unfair prejudice." As explained in the above section, the gunshot residue in this case was not collected under ideal circumstances, but the evidence was not so inherently unreliable as to lack any probative value. Moreover, the gunshot residence evidence did not "tend[ ] to create an emotional bias against" defendant that posed a potential to "inflame the jury." (*People v. Lucas* (2014) 60 Cal.4th 153, 268.) Defendant's criticisms regarding the gunshot residue collection process in this case "attach to the weight of the evidence," and thus did not require its exclusion pursuant to Evidence Code section 352. (See *id.* at p. 231.)

**Lack of Foundation**
Finally, defendant contends the trial court would have been required to exclude the gunshot residue evidence because there was no foundation—specifically, that no evidence established that there had been no contamination or transfer.

Relying on chain of custody principles, defendant contends the trial court could not have found " ' "that, taking all the circumstances into account including the ease or difficulty with which the particular evidence could have been altered, it is reasonably certain that there was no alteration." ' " (*People v. Catlin* (2001) 26 Cal.4th 81, 134 (*Catlin* ).)

" ' "The requirement of reasonable certainty is not met when some vital link in the chain of possession is not accounted for, because then it is as likely as not that the evidence analyzed was not the evidence originally received. Left to such speculation the court must exclude the evidence. [Citations.] Conversely, when it is the barest speculation that there was tampering, it is proper to admit the evidence and let what doubt remains go to its weight." [Citations.]' [Citations.]" (*Catlin, supra,* 26 Cal.4th at p. 134.) This determination is left to the discretion of the trial court. (*Ibid.*) Here, the gunshot residue collection process was not performed under ideal circumstances, but nothing about the process was analogous to a missing "vital link" in a chain of possession. (See *Catlin, supra,* 26 Cal.4th at p. 134.) It was not merely speculative to conclude that defendant had a gunshot residue particle and individual element particles on his hands and sweatshirt because he had, in fact, discharged a firearm. Thus, the trial court could reasonably have determined that the evidence was admissible and let any doubt about its reliability " ' "go to its weight." ' " (*Ibid.*)

15

> **Counsel Was Not Ineffective**
> Defendant has failed to establish that a motion to exclude the gunshot
> residue evidence would have been meritorious. On this record, defendant's
> trial counsel made a reasonable decision not to pursue such a motion.
> Thus, defendant has not established that his trial counsel's performance
> was deficient, and we conclude that defendant's trial counsel was not
> ineffective. (See *Lopez, supra,* 42 Cal.4th at p. 966.)

*Id.* at*5-8. The Court addresses separately whether counsel's failure to (1) investigate, (2) consult and retain an expert on, and (3) move to exclude the GSR evidence was IAC.

1. Failure to investigate

First, petitioner argues that his counsel provided ineffective assistance of counsel when he failed to obtain and review readily-accessible literature on the required procedures for collecting and testing GSR samples. Bautista contends that counsel could have used publicly-available law enforcement guidelines in moving to exclude the GSR evidence. According to petitioner, these guidelines provide a basis to exclude the GSR evidence because the guidelines discourage use of GSR samples collected more than four hours post-shooting and specifically recognize that a handcuffed person's hands can be contaminated by GSR in the backseat of a squad car. The state court disagreed.

With regard to the first guideline, the state court found that law enforcement protocols on appropriate GSR testing timelines reflect significant differences in opinion. According to the FBI Law Enforcement Bulletin from 2011, some participants at the FBI Laboratory Gunshot Residue Symposium would view that the six-hour lag between the shooting and sampling at issue here as appropriate. In fact, others participants reported that they felt comfortable accepting samples more than 12 hours after a shooting. Thus, the state court found that Bautista failed to establish that the four-hour time lag at issue here rendered the GSR evidence so unreliable as to warrant exclusion. The state court's determination was reasonable and subject to this Court's deference.

The second guideline states that GSR samples, "preferably" should be taken before the suspect is transported to the police station. Further, it specifies that samples should be taken prior to handcuffing. As the state court recognized, the samples here were taken *after* petitioner was handcuffed, transferred to the squad car, and transported to the police station. On the other hand,

the state court cited contrary evidence indicating that these collection deficiencies did not cause the GSR evidence to be present on petitioner's person. Notably, the GSR evidence included a complete particle of GSR and individual component elements on both of petitioner's hands, both sleeves of his sweatshirt, and the front of his sweatshirt. The state court reasonably determined that the presence of multiple particles on different areas of petitioner's body and clothing negated the possibility of contamination or interference. Had the GSR been transferred to petitioner when petitioner was being handcuffed or transferred to the police station, the court reasoned, it is unlikely that GSR components would be found on several different parts of petitioner's body and clothing. Accordingly, the Court of Appeal concluded that trial counsel was not ineffective because petitioner failed to establish that a motion to exclude the GSR based on the above-referenced literature would not have been meritorious. The Court finds that this determination was reasonable and subject to this Court's deference.[2]

Consequently, the Petition on this ground is **DENIED**.

### 2. Failure to Consult and Hire a GSR Expert

Petitioner's second argument centers on counsel's failure to consult and hire an expert on GSR. Here, counsel consulted with Dr. Diaz, a professor in the department of biomedical, chemical, and materials engineering at San Jose State University, College of Engineering, before deciding to withdraw counsel's motion *in limine* to exclude the GSR evidence. Petitioner claims that Dr. Diaz was not qualified to educate counsel on GSR or the reliability of the collection methods in this case. The state court did not specifically discuss this argument, but did state generally that Bautista failed to establish that a motion to exclude the GSR evidence would have been meritorious.

The Court finds that counsel was not deficient in failing to hire an expert on GSR. After consulting Dr. Diaz, counsel determined that a motion *in limine* to exclude the GSR evidence

---

[2] Even assuming, *arguendo*, that counsel's failure to investigate was deficient, petitioner cannot establish prejudice. There was substantial evidence apart from the GSR that petitioner had discharged the firearm, including Tangs's and Hong's descriptions of petitioner shortly after the crime, and Tang's identification of petitioner at a photo lineup. Accordingly, any error would have been harmless. Thus the state courts' rejection of petitioner's claim was not contrary to or an unreasonable application of a clearly established federal law. 28 U.S.C. § 3364(d)(1).

17

would have failed. Counsel was not required to "shop" for experts who might have provided a different opinion or focused on a different aspect of the evidence. *See Turner v. Calderon*, 281F. 3d 851, 875-876 (9th Cir. 2002); *Babbitt v. Calderon*, 151 F.3d 1170, 1174 (9th Cir. 1998); *Hendricks v. Calderon*, 70 F.3d 1032, 1038-1039 (9th Cir. 1995). "In many instances cross-examination will be sufficient to expose defects in an expert's presentation." *Richter*, 562 U.S. at 111. Counsel is not required to put on an expert on GSR merely because the prosecution opted to do so. *Richter*, 562 U.S. at 111("*Strickland* does not enact Newton's third law for the presentation of evidence, requiring for every prosecution expert an equal and opposite expert from the defense . . . ."); *Bonin v. Calderon*, 59 F.3d 815, 838 (9th Cir. 1995) ("while the Constitution requires that a criminal defendant receive effective assistance of counsel, the presentation of expert testimony is not necessarily an essential ingredient of a reasonably competent defense"); *Miller v. Anderson*, 255 F.3d 455, 459 (7th Cir. 2001) ("A defendant's lawyer does not have a duty in every case to consult experts even if the government is proposing to put on expert witnesses.").

      Here, counsel consulted with a professor of biomedical, chemical, and materials engineering before deciding to withdraw the motion *in limine* to exclude the GSR. This was sufficient. Trial counsel's decision not to retain an expert was not deficient because counsel had no duty to do so. *See Richter*, 562 U.S. at 111; *Bonin v*, 59 F.3d at 838; *Miller v. Anderson*, 255 F.3d at 459. Further, even assuming, *arguendo*, that counsel's decision not to retain an expert was deficient, petitioner cannot show prejudice. Counsel's cross-examination of Ms. Hengoed was "sufficient to expose defects in an expert's presentation," *Richter*, 562 U.S. at 111, as counsel elicited an admission from Ms. Hengoed that the GSR evidence was not conclusive of petitioner's firearm use.[3]

      Once again, the Court finds that the state court's determination that counsel was not ineffective was reasonable and subject to this Court's deference.

      Thus, the Petition on this ground is likewise **DENIED**.

---

[3] Petitioner argues in passing that trial counsel's cross examination of the prosecution's GSR expert was inadequate. Because this argument was not presented to the California Court of Appeal or California Supreme Court, this Court may not consider the merits of this claim. *See Rose v. Palmateer*, 395 F.3d 1108, 1110 (9th Cir. 2005) ("Pursuant to 28 U.S.C. § 2254(b)(1)(A), a federal court may not consider the merits of [petitioner's] claim unless he has exhausted all available state court remedies...").

### 3. Failure to move to exclude GSR Evidence

Finally, petitioner argues generally that counsel's failure to move to exclude the GSR and expert testimony of Ms. Hengoed was IAC. Bautista contends that the GSR evidence was so unreliable as to require exclusion. Based thereon, petitioner claims Ms. Hengoed's expert testimony, which was based on the GSR evidence, would lack foundation. However, as discussed above, the state court reasonably determined that criticisms of the GSR went to weight, not admissibility.

Further, Ms. Hengoed specifically addressed flaws in the GSR collection process during her testimony. She conceded, during cross-examination, the possibility that the GSR was transferred to petitioner when petitioner was handcuffed or in the squad car. The state court reasonably found that the GSR collection method, while flawed in some ways, was not so unreliable as to require exclusion. *See People v. Catlin*, 25 Cal. 4th 81, 134 (2001). Therefore, any criticism of Ms. Hengoed's testimony similarly went to weight, not admissibility. Accordingly, the Court of Appeal's conclusion that it was not outside the scope of professional conduct for petitioner's trial counsel to decide not to bring a motion to exclude the GSR evidence or the testimony of Ms. Hengoed was reasonable and subject to this Court's deference.

Thus, the Petition on this ground is **DENIED**.

### IV. CONCLUSION

For the foregoing reasons, the Court **DENIES** the Petition for Writ of Habeas Corpus as to Petitioner's claim of ineffective assistance of counsel. A certificate of appealability will not issue. Reasonable jurists would not "find the [Court's] assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Petitioner may seek a certificate of appealability from the Ninth Circuit Court of Appeals. The Clerk shall enter judgment in favor of respondent and close the file.

**IT IS SO ORDERED.**

Dated: July 11, 2017

YVONNE GONZALEZ ROGERS
United States District Judge